

CLERK'S OFFICE
A TRUE COPY
Nov 05, 2020
s/ Daryl Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 20 MJ 215 |
| Information related to two Facebook accounts associated with Daryl Edlebeck | ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 331 et seq; 829; 841; 843 | distribution of controlled substances; distribution of controlled substances via the internet; introduction and receipt of misbranded drugs and/or food; misbranding drugs and/or food |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SCOTT SIMONS (Affiliate)   Digitally signed by SCOTT SIMONS (Affiliate) Date: 2020.11.05 16:22:23 -06'00'

*Applicant's signature*

DEA TFO Scott Simons

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: November 5, 2020

*William E. Duffin*

*Judge's signature*

City and state: Milwaukee, WI

Hon. William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

## Matter No. 2020R00261

I, Scott Simons, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with certain Facebook user IDs that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. (Facebook), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user IDs.

2.     I am a Task Force Officer assigned to the Milwaukee Office of the Drug Enforcement Administration (DEA) as a member of the Tactical Diversion Squad (TDS), specializing in pharmaceutical investigations.  I have worked full-time as a DEA Task Force Officer for the past 7 years and a full-time law enforcement officer with the Greenfield Police Department for the past 18 years.

3.     During my tenure as a DEA Task Force Officer and a Greenfield Police Department law enforcement officer, I have been involved in the investigation of narcotics traffickers operating not only in the County of Milwaukee and the State of

Wisconsin, but also other states throughout the United States and various other countries. I have received training in the investigation of drug trafficking and computer related crimes. I have worked with informants in the investigations of drug trafficking in the Milwaukee area as well as other jurisdictions within the State of Wisconsin, throughout the United States, and other countries. I have participated in the application for and execution of numerous search warrants. I have participated directly in numerous narcotics investigations and arrests in which controlled substances and drug paraphernalia were seized. I am familiar with methods that are commonly used by drug dealers to package and prepare controlled substances for sale in various areas.

4. Based on my training, experience, and participation in drug trafficking and computer related investigations, I know and have observed the following:

a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b. I am familiar with the coded language utilized over the telephone and other electronic communications to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

c. I know drug dealers often put telephones in the names of others (nominees) in order to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

d. I know drug traffickers often purchase and/or title assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets

2

are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

e.      I know drug traffickers must maintain on-hand large amounts of U.S. currency, to include monies stored in financial accounts readily accessible in order to maintain and finance their ongoing drug business;

f.      I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, and receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. The aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them. These may be in paper form as well as in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices;

g.      I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

h.      I know it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control, as well as in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices;

i.      I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

3

j.      I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

k.      I know drug traffickers commonly maintain addresses or telephone numbers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization in papers and books  as well as in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices;

l.      I know drug traffickers take or cause to be taken photographs or videos of themselves; their associates, their property and their drugs. These traffickers usually maintain these photographs or videos in their possession, often in digital form on computers, Smartphones, cellphones, and other electronic media or electronic storage devices;

m.      I am familiar with computers, cellular telephones, Smartphones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers; Drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, thumbnail drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices;

n.      I know the following information can be retrieved to show evidence of use of a computer or Smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user

4

names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that DARYL EDLEBECK and others have committed, and continue to commit, violations of violations of: (i) Title 21, United States Code, Sections 829(e) and 841(a)(1) (Distribution of Controlled Substances); (ii) Title 21, United States Code, Sections 841(h) and 843(c)(2)(A) (Offenses involving distribution of Controlled Substances by means of the Internet); (iii) Title 21, United States Code, Sections 331(a) and 333(a)(1)/(2) (introduction of misbranded drugs and/or foods into interstate commerce); (iv) Title 21, United States Code, Sections 331(c) and 333(a)(1)/(2) (receipt of misbranded drugs and/or foods in interstate commerce, and delivery thereof for pay or otherwise); and (v) Title 21, United States Code, Sections 331(k) and 333(a)(1)/(2) (doing an act to a drug and/or food after shipment in interstate commerce and while held for sale that results in the article being misbranded). There is also probable cause to search the information described in Attachment A for fruits, evidence and instrumentalities of these crimes, as further described in Attachment B.

## IDENTIFICATION OF ITEMS TO BE SEARCHED

7.     The information to be searched concerns the Facebook pages belonging to **Mass Labs** - **ID #674111559308838** and **New Heights Supplements** - **ID #529165487123045**, herein described as personal websites that are accessed with a username and password specific only to that page and further described in Attachment A.   The applied-for warrant would authorize the search and recovery of evidence particularly described in Attachment B.

## JURISDICTION

8.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, this Court is a district court of the United States that "has jurisdiction over the offense[s] being investigated." 18 U.S.C. § 2711(3)(A)(i).  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## THE FDCA

### FDA's Regulation of Drugs

9.     The United States Food and Drug Administration (FDA) is the federal agency responsible for protecting the public health and safety of the American public by enforcing the Food, Drug, and Cosmetic Act (FDCA).  Among the purposes of the FDCA is to ensure, among other things, that drugs sold for human use are safe and effective for their intended uses, and bear labeling containing true and accurate information.   FDA's responsibilities under the FDCA include regulating the

6

manufacture, labeling, and distribution of drugs that are shipped or received in interstate commerce.

10. The FDCA defines a "drug" to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man," and "articles . . . intended to affect the structure or any function of the body of man." 21 U.S.C. § 321(g)(1)(B) and (C).

11. Under the FDCA, a drug is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular. 21 U.S.C. § 352(a).

12. "Labeling" is defined under the FDCA as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). In turn, the term "label" includes "written, printed, or graphic matter upon the immediate container of any article." *Id.* at § 321(k).

13. Under the FDCA, "prescription drugs" include drugs that, because of their toxicity and other potential for harmful effects, are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs. 21 U.S.C. § 353(b)(l)(A).

14. Under the FDCA, dispensing a prescription drug without a valid prescription of a licensed practitioner is deemed to be an act that misbrands the drug while held for sale. 21 U.S.C. § 353(b)(1).

**FDA's Regulation of Dietary Supplements**

15.     The FDCA defines "dietary supplement" to include "a product (other than tobacco) intended to supplement the diet that bears or contains one or more of the following dietary ingredients. . . (A) a vitamin; (B) a mineral; (C) an herb or other botanical; (D) an amino acid; (E) a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or (F) a concentrate, metabolite, constituent, extract, or combination of any ingredient described in clause (A), (B), (C), (D), or (E)." 21 U.S.C. § 321(ff)(1).  Additionally, to be a "dietary supplement" under the FDCA, the product must be intended for ingestion, not be represented for use as a conventional food or as a sole item of a meal or the diet, and be labeled as a dietary supplement.  21 U.S.C. § 321(ff)(2).

16.     With limited exceptions, a dietary supplement is deemed to be a food under the FDCA.  21 U.S.C. § 321(ff)(3).  In turn, the FDCA defines "food" to include articles used for food or drink for man or other animals and articles used for components of such articles.  21 U.S.C. § 321(f).

17.     A food, including a dietary supplement, is misbranded if its labeling is false or misleading in any particular.  21 U.S.C. § 343(a)(1).

18.     A product cannot be a "dietary supplement" under the FDCA, however, if it contains:

      a.   the active pharmaceutical ingredient (API) of an FDA-approved drug, 21 U.S.C. § 321(ff)(3)(B)(i); and/or

8

b. the API of a new drug that FDA has authorized for investigation and for which substantial clinical investigations have been instituted and for which the existence of such investigations has been made public, 21 U.S.C. § 321(ff)(3)(B)(ii).

19. A dietary supplement also is deemed to be adulterated if, (1) it contains a dietary ingredient that presents a significant or unreasonable risk of illness or injury under the conditions of use recommended or suggested in its labeling, 21 U.S.C. § 342(f)(1)(A)(i),; or (2) it contains a new dietary ingredient for which there is inadequate information to provide reasonable assurance that such ingredient does not present a significant or unreasonable risk of illness or injury, 21 U.S.C. § 342(f)(1)(B).

20. Under 21 U.S.C. § 350b, a dietary supplement that contains a new dietary ingredient (one not marketed in the United States before October 14, 1994) is deemed to be adulterated under 21 U.S.C. § 342(f) unless, (1) the dietary supplement contains only dietary ingredients that have been present in the food supply as an article used for food in a form in which the food has not been chemically altered, or (2) there is a history or use or other evidence of safety establishing that the dietary ingredient will reasonably be expected to be safe and, at least 75 days before introducing the dietary supplement in interstate commerce, the manufacture or distributor provides FDA with information which is the basis for its conclusion that the dietary supplement containing the new dietary ingredient will reasonably be expected to be safe ("premarket notification"). 21 U.S.C. § 350b.

**FDCA Prohibited Conduct and Penalties**

9

21.     The FDCA prohibits, among other things, the doing or causing of the following acts:

    a.   The introduction or delivery for introduction into interstate commerce any food or drug that is adulterated or misbranded, 21 U.S.C. § 331(a);

    b.   Receiving a misbranded drug or food in interstate commerce, and delivering or proffering delivery thereof for pay or otherwise, 21 U.S.C. § 331(c); and

    c.   The doing of any act with respect to a food or drug if such act is done while such article is held for sale ("whether or not the first sale") after shipment in interstate commerce and results in such article being adulterated or misbranded, 21 U.S.C. § 331(k).

22.     The FDCA defines interstate commerce as "(1) commerce between any State or Territory and any place outside thereof, and (2) commerce within the District of Columbia or within any other territory not organized with a legislative body." 21 U.S.C. § 321(b).

10

23.     Any person who commits a prohibited act under the FDCA commits a misdemeanor, regardless of any *mens rea*, punishable by a maximum of imprisonment for one year.  21 U.S.C. § 333(a)(1).  If committed with the intent to defraud or mislead consumers and/or a governmental agency, the violation constitutes a felony and is punishable by up to three years imprisonment.  21 U.S.C. § 333(a)(2).

## FACTS ESTABLISHING PROBABLE CAUSE

24.     In March of 2020, the Milwaukee District Office of the DEA initiated an investigation into the businesses New Heights Supplements and Mass Labs, to include their websites (www.nhsupps.com and www.mass-labs.com), which are owned by DARYL EDLEBECK.  It was brought to the attention of DEA that DARYL EDLEBECK was potentially selling controlled substances (steroids) and other products labeled as dietary supplements, which in fact that consisted of substances that cannot lawfully be contained in dietary supplements.  DARYL EDLEBECK owns four brick-and-mortar dietary supplement stores (in Waukesha, Hales Corners, Greenfield, and Racine), which are referred to collectively as New Heights Supplements.  DARYL EDLEBECK also owns his own manufacturing company, Mass Labs, and his affiliated website sells only Mass Labs dietary supplement products.  DARYL EDLEBECK sells Mass Labs products, as well as products produced by other manufacturers, in his New Heights Supplements brick-and-mortar stores and on the New Heights Supplements website.

25.     In March of 2020, a citizen witness, hereinafter referred to as P.B., spoke with DEA Milwaukee District Office case agents in person.  The statements from P.B. to

11

the DEA case agents led to this investigation being initiated. P.B. reported that in October 2016, P.B. purchased a dietary supplement directly from DARYL EDLEBECK at the New Heights Supplements store located in Hales Corners, Wisconsin. DARYL EDLEBECK said the product would help P.B. gain muscle and burn fat. P.B. began using this product shortly thereafter, but in December 2016 or January 2017, P.B. began experiencing muscle aches, headaches, heart problems, and an overall feeling of being ill. P.B. spoke with DARYL EDLEBECK about this product and his medical ailments. DARYL EDLEBECK said this product was a prohormone, and DEA case agents know, from their training and experience, that many products marketed as "prohormones" have been found to contain schedule III anabolic steroids when tested. DARYL EDLEBECK told P.B. some side effects from his product are hair loss and testicular problems, which DEA case agents know are also side effects of steroid use.

26.     P.B. has since been seeking medical treatment from specialists throughout the United States. In May 2019, P.B. provided five to six of the remaining capsules from the purported dietary supplement product he purchased from DARYL EDLEBECK to a private laboratory (ARCpoint Labs located in Brookfield, Wisconsin), and the laboratory's analysis identified the substance in the capsules as "Boldenone (Steroid)." DEA case agents know that boldenone is a schedule III controlled substance.

27.     P.B. turned over the original bottle, containing thirty-four capsules, to DEA case agents. This product was named "Reaper," and its label stated it was a dietary supplement. The label also stated the product was manufactured by Mass Labs

12

(www.mass-labs.com), and suggested the company has a Facebook account. The label stated that statements on the label were not evaluated by the FDA.

28.     DEA case agents submitted the "Reaper" capsules to the Wisconsin State Crime Laboratory for analysis. The laboratory's initial screening test indicated the presence of methasterone (a schedule III controlled substance – steroid) and Androsta-3,5-diene-7,17-dione  (also known as "Arimistane") (a substance that is not considered a dietary ingredient under the FDCA). This drug exhibit has been turned over to the FDA for further analysis, and these results are pending. The DEA and FDA are now jointly conducting this investigation.

29.     DEA case agents reviewed the Mass Labs website. This website identifies the Mass Labs founder as DARYL EDLEBECK, who reportedly began his career in the dietary supplements industry in 2016. The Mass Labs phone number provided on the website is (414) 425-2605. DEA case agents checked law enforcement and open source databases and found this phone number is also the phone number for the New Heights Supplements store located in Hales Corners. DEA case agents, in an undercover capacity, made telephone contact with the New Heights Supplements store in Greenfield, and the employee stated the stores were owned by "Daryl."

30.     On May 7, 2020, undercover DEA case agents conducted a controlled buy from the New Heights Supplements store located in Hales Corners. The undercover agent interacted directly with DARYL EDLEBECK, who was identified based on viewing a known photograph of DARYL EDLEBECK. DARYL EDLEBECK sold the

undercover agent several products intended to help the undercover "gain muscle." One product in particular was named "Superdrol," which was manufactured by a company named Anabolic Research. DEA case agents are aware Superdrol is another term for methasterone (a schedule III controlled substance). When asked how these products compare to steroids, DARYL EDLEBECK said they are the same concept. DARYL EDLEBECK also sold the undercover agent a product named "On Cycle," which is taken during a steroid or prohormone cycle to aid liver support, prostate support, cholesterol, and blood pressure, to help ameliorate the toll steroids and prohormones have on the human body.

31. During this purchase, DARYL EDLEBECK pointed to the Superdrol product and told the undercover agent that this manufacturing company is "edgier." DARYL EDLEBECK also said that he used to have the same product made for him with a slightly different compound, but the person who previously made the product for him received a letter from the FDA ordering the product no longer be made or there would be ramifications. DARYL EDLEBECK explained that he formulates his own products, but he sends his formula off to be mixed because he does not have the necessary equipment. DARYL EDLEBECK stated he used to have a product called "Methyl Mass" produced for him, but the person who made it "had more eyes on him" so that person "started playing by the rules."

32. DEA case agents submitted these purchased products to the DEA Laboratory for analysis. The Superdrol product tested positive for the presence of

14

methasterone (a schedule III controlled substance).  The other products did not test positive for a controlled substance.

33.    DEA case agents located and reviewed a Facebook page belonging to **"Mass Labs" – ID #674111559308838**.  This Facebook page shows various Mass Labs products for sale and advertises sale prices.  DEA case agents noted a post on this Facebook page dated August 27, 2016.  This post consisted of a photograph of three dietary supplement products for sale.  One product was "Reaper," which is the product P.B. turned over to DEA case agents and is suspected to contain a schedule III controlled substance.  The second product was called "Methyl Mass," which is the product DARYL EDLEBECK said his "mixer" stopped producing because the "mixer" started "playing by the rules."  The product label on the "Methyl Mass" bottle states it is a dietary supplement and lists ingredients of methylstenbolone and DMZ (also known as "Dymethazine"). Methylstenbolone and DMZ  have been described by the FDA in a Warning Letter as being "synthetic steroids [which] do not constitute dietary ingredients."       (https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/hardcore-formulations-522783-06052017).  The third product depicted on the Facebook page was called "Trestone."  This Facebook page advertises the Mass Labs website, www.mass-labs.com, and references the phone number for New Heights Supplements in Hales Corners.

34.    DEA case agents also located and reviewed a Facebook page belonging to **"New Heights Supplements" – ID #529165487123045**.  This Facebook page shows

various products labeled as dietary supplements for sale and advertises sale prices. It has up-to-date posts and photographs that cover topics such as new products, when they opened their newest store location in Waukesha, which employee is in charge of various applications, and photographs of customers and the products on the shelves inside the store. Some of these photographs depict the Superdrol product, which is suspected to contain methasterone (a schedule III controlled substance). A post dated April 25, 2018, showed "Methyl Mass," "Trestone," and other products labeled as dietary supplements. Additionally, a post dated August 8, 2017, includes a photograph of DARYL EDLEBECK and other employees, and a post dated December 26, 2016, consists of a photograph showing "Reaper" (same product purchased by P.B. and turned over to DEA case agents) and "Methyl Mass." The Facebook page advertises the New Heights Supplements website, www.nhsupps.com, and the phone number for the Hales Corners location.

35.     On June 15, 2020, an undercover DEA case agent entered New Heights Supplements located in Waukesha and observed multiple bottles of the Superdrol product displayed on a shelf, which is suspected of containing methasterone.

36.     On July 20, 2020, an undercover DEA case agent entered New Heights Supplements located in Racine and observed multiple bottles of the Superdrol product displayed on a shelf, which is suspected of containing methasterone.

37.     On July 22, 2020, FDA case agents conducted an online controlled buy from the Mass Labs website, www.mass-labs.com, and purchased one bottle of "Slim-

A-Drex Extreme." The product label stated it was a "dietary supplement" and listed 2-aminoisoheptamine (suspected to be an alternate name for a compound known as DMHA) as an ingredient, which FDA has publicly stated cannot lawfully be marketed as a dietary supplement. According to FDA.gov, DMHA is considered an unsafe dietary ingredient in dietary supplements. The FDA's Center for Food Safety and Applied Nutrition has issued several Warning Letters to companies selling dietary supplements containing DMHA as a dietary ingredient (https://www.fda.gov/food/dietary-supplement-products-ingredients/dmha-dietary-supplements). The return address on the parcel that contained this product was "Mass Labs 5300 South 108th St., STE 3, Hales Corners, WI 53130-1368," which is the address of New Heights Supplements in Hales Corners. DEA case agents received records from the U.S. Postal Inspections Service, which confirmed this parcel was shipped from the Hales Corners Post Office and was delivered to the undercover FDA case agents. This product has been sent to the FDA laboratory for analysis, and the results are pending.

38. On July 24, 2020, a DEA undercover case agent conducted a controlled purchase directly from DARYL EDLEBECK at the Hales Corners location. The undercover agent purchased multiple products. One product was the same Superdrol product that is suspected to contain methasterone. A second product was "M-Sten," which is advertised to contain methylstenbolone (an ingredient that FDA has publicly stated cannot lawfully be marketed in dietary supplements), and DARYL EDLEBECK also verbally told the undercover agent that it contains methylstenbolone. A third

17

product purchased was named "On Cycle." These products have all been sent to the DEA and FDA laboratories for analysis. The Superdrol product tested positive for the presence of methasterone (a schedule III controlled substance), and the remaining results are pending.

39.     On August 4, 2020, an undercover DEA case agent conducted a controlled purchase directly from DARYL EDLEBECK at the Hales Corners location. The undercover agent purchased the same previously referenced Superdrol product, which is suspected to contain methasterone. The undercover agent had a conversation with DARYL EDLEBECK in which DARYL EDLEBECK said that Superdrol and methasterone are the same substance. DARYL EDLEBECK told the undercover agent that the undercover agent would not test positive for the presence of any drugs pursuant to a standard drug test conducted by an employer, but the undercover agent would test positive in a performance enhancing drug test. This product was sent to the DEA laboratory for analysis and tested positive for the presence of methasterone (a schedule III controlled substance).

40.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the Facebook pages belonging to **Mass Labs - ID #674111559308838** and **New Heights Supplements - ID #529165487123045**, used by DARYL EDLEBECK (W/M DOB: 09-13-1983), contain evidence of crimes committed in violation of: : (i) Title 21, United States Code, Sections 829(e) and 841(a)(1) (Distribution of Controlled Substances); (ii) Title 21, United States Code, Sections 841(h)

18

and 843(c)(2)(A) (Offenses involving distribution of Controlled Substances by means of the Internet); (iii) Title 21, United States Code, Sections 331(a) and 333(a)(1)/(2) (introduction of misbranded drugs and/or foods into interstate commerce); (iv) Title 21, United States Code, Sections 331(c) and 333(a)(1)/(2) (receipt of misbranded drugs and/or foods in interstate commerce, and delivery thereof for pay or otherwise); and (v) Title 21, United States Code, Sections 331(k) and 333(a)(1)/(2) (doing an act to a drug and/or food after shipment in interstate commerce and while held for sale that results in the article being misbranded).

## BACKGROUND CONCERNING FACEBOOK

41.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

42.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

19

43.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

44.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

45.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also

post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

46.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

47.     Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that

allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

48. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

49. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

50. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

51. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

52. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

53. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

54. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

55. Facebook further maintains a functionality it refers to as "Stories," whereby users can post photos and videos using Facebook's "in app" camera, frequently utilizing filters and additional text. After a user "posts" a "Story," the "Story" will be available to their "friends" for a 24-hour period, appearing at the top of their "News Feed" in the application.

56. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

57. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered

23

to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

58. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

59. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

60. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

61. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further,

Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

62. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

26

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

63. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

64. Based on the forgoing, I request that the Court issue the proposed search warrant.  Because the warrant will be served on Facebook who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

27

## ATTACHMENT A

**Matter No. 2020R00261**

This warrant applies to information generated from January 1, 2016 to the present date associated with DARYL EDLEBECK's Facebook pages, **Mass Labs - ID #674111559308838** and **New Heights Supplements - ID #529165487123045**, which are stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

**Particular Things to be Seized**

**I.      Information to be disclosed by Facebook**

To the extent that the information described below is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a.      All contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b.      All activity logs and all other documents showing the user's posts and other Facebook activities;

c.      All "Stories" associated with either account;

d.      All photos uploaded by those user ID's and all photos uploaded by any user that have that user tagged in them;

e.      All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings;

2

friend lists, including the friends' Facebook user identification numbers; groups and networks of which the either user ID is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

f.    All other records of communications and messages made or received by either user ID, including all private messages, chat history, video calling history, and pending "Friend" requests;

g.    All "check ins" and other location information;

h.    All IP logs, including all records of the IP addresses that logged into either account;

i.    All records of either account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

j.    All information about the Facebook pages that either account is or was a "fan" of;

k.    All past and present lists of friends created by either account;

l.    All records of Facebook searches performed by either account;

m.    All information about either account's access and use of Facebook Marketplace;

n.    The types of Facebook services utilized by the accounts;

3

o. The length of service (including start date) and the means and source of any payments associated with the accounts Facebook usage (including any credit card or bank account number);

p. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by either account;

q. All records pertaining to communications between Facebook and any person regarding either account, including contacts with support services and records of actions taken.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 331(a), 331(c), 331(k), 333(a)(1)/(2), 829(e), 841(a)(1), 841(h) and 843(c)(2)(A) for each user ID identified on Attachment A, including information pertaining to the following matters:

(a) The importation and distribution of controlled substances and other prescription medications.

(b) Information relating to the identity of any and all individuals who operate or maintain online pharmacies that sell controlled substances and other prescription medications.

(c) Evidence indicating how and when either Facebook account was accessed or used, to determine the chronological and geographic context of account

4

access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(d) Evidence indicating the state of mind of either account's owner as it relates to the crimes under investigation;

(e) The identity of the person(s) who created or used either account, including records that help reveal the whereabouts of such person(s).

(f) The identity of the person(s) who communicated with either account about matters relating to relevant offense conduct of distribution of controlled substances, including records that help reveal their whereabouts.

5